COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.                                                SUPERIOR COURT
                                                            CIVIL NO.

_____
                                )
BECK BODE, LLC,                 )
                                )
              Plaintiff,        )
                                )
v.                              )
                                )
CAROLANN BROWN,                 )
                                )
              Defendant.        )
_____)

## COMPLAINT

1.      Beck Bode, LLC ("Beck Bode"), the Claimant herein, is a limited liability company with its principal place of business in Dedham, Massachusetts.

2.      Carolann Brown ("Brown"), the Respondent herein, is an individual residing in Portsmouth, Rhode Island.

3.      Beck Bode is an investment advisory firm registered with the Securities and Exchange Commission, which offers investment advice and portfolio management services primarily to individuals.

4.      For approximately 34 years, Brown worked as an investment adviser representative of several investment advisory firms, developing a book of business and various client relationships.

5.      In or about the fourth quarter of 2021, Brown was approximately 75 years old and beginning to plan for her retirement from the investment advisory business.

1

6.      In or about the fourth quarter of 2021, Brown and Beck Bode began discussing a deal wherein Beck Bode would purchase Brown's existing client relationships and goodwill, and these clients would become advisory clients of Beck Bode.

7.      The parties engaged in numerous discussions and negotiations regarding Beck Bode's acquisition of Brown's client relationships.

### The Agreements

8.      On or about March 28, 2022, Beck Bode and Brown executed a Business Succession Agreement (the "Succession Agreement") providing for the assignment of all of Brown's client relationships and associated goodwill to Beck Bode. (A true copy of the Succession Agreement is attached hereto as Exhibit A.)

9.      The Succession Agreement referred to Brown's clients being assigned to Beck Bode as the "Assigned Clients."

10.      In exchange for her client relationships, the Succession Agreement provided that Brown would receive ongoing payments in the amount of 30% of all net revenues received by Beck Bode from the assigned clients for seven years from the date of the Succession Agreement.

11.      On or about March 28, 2022, Beck Bode and Brown also executed an employment agreement ("Employment Agreement") pursuant to which Brown was to provide services as a Senior Client Consultant, including "helping clients in their transition to the Company, providing background information on such clients and their historical needs and such other matters that may be assigned to [her] by the Company." (A true copy of the Employment Agreement is attached hereto as Exhibit B.)

12.      The Employment Agreement provides:

> For the avoidance of doubt, as of the Effective Date, you will not be employed as an Investment Advisor Representative ("IAR") of the

Company, and your duties will not include any services which would require you to be registered as an IAR with the Securities and Exchange Commission ("SEC") or any state regulatory authority, including, but not limited to, making trades on behalf of clients or providing any discretionary or non-discretionary investment services to clients. From and after the Effective Date, you agree that you will not hold yourself out as an IAR and will otherwise abide by the laws and rules of all governmental, regulatory and self-regulatory entities that govern our and your activities, as well as all Company policies and procedures as may be promulgated from time to time

13.     The Succession Agreement contains a non-solicitation clause providing that Brown "will not, in any manner, directly or indirectly, Solicit (as defined below) any client or prospective client of Beck Bode's, or otherwise interfere with or damage (or attempt to do either) any relationship between Beck Bode and any such client or prospective client, person or entity."

14.     The Employment Agreement contains a non-solicitation clause providing that Brown "will not, in any manner, directly or indirectly, Solicit (as defined below) any client or prospective client or ours to whom you provided services or whom you contacted for the purpose of developing business for us or whose name became known to you while you were employed by the Company, or otherwise interfere with or damage (or attempt to do either) any relationship between us and any such client or prospective client, person or entity."

15.     The Succession Agreement and the Employment Agreement both contain substantively identical definitions of the term "Solicit." The Succession Agreement defines "Solicit" to mean:

directly or indirectly contacting or communicating in any manner with clients or prospective clients, whether orally, in person, electronically, telephonically, in writing or otherwise, with the intent or where the effect is to influence or facilitate in any degree, induce or cause any client or prospective client to: (i) transfer business (e.g. assets) or business relationships from Beck Bode to Brown or any other person or entity; (ii) obtain services similar to those provided by Beck Bode or its affiliated from Beck Bode or any other person or entity; (iii) open with Brown or any other person or entity an investment advisory, investment management, insurance, asset management or brokerage account or relationship; or (iv)

3

otherwise discontinue or diminish a business or financial relationship with Beck Bode.

16.     The Employment Agreement contains a non-disparagement clause providing that Brown "shall at no time, during your employment or at any time thereafter, engage in conduct or communication, directly or indirectly, which injures, harms, corrupts, demeans, defames, disparages, libels, slanders, destroys or diminishes in anyway the reputation or goodwill of the Company, its clients and prospective clients, its affiliates, or the Company's and its affiliates' respective employees, consultants, agents or service providers."

17.     The Employment Agreement provides that Brown "will maintain the highest standards of honest and fair dealing in your work for and on behalf of the Company."

### Brown Continues to Provide Investment Advisory Services

18.     Although the Employment Agreement makes clear that Brown was not an investment adviser representative of Beck Bode and was not authorized to make trades or provide any discretionary or non-discretionary investment services to clients, she continued to provide such services and to hold herself out as an investment adviser representative, without the knowledge or consent of Beck Bode.

19.     On April 22, 2022, a client emailed Brown to ask why Brown had been removed as manager of his account. Brown did not acknowledge or explain this, but instead responded to the client: "There is absolutely no way I would ever drop you as a client. – you are one of my favorite clients." In a subsequent email to the client the same day, she expressed frustration about Beck Bode's servicing of her clients.

20.     On August 1, 2022, Brown wrote to a client: "would love to start nibbling a little but slowly.. maybe some utilities shares to give us some cushion if market falls badly.. ben waiting to see about Taiwan. ben my big fear for a while and now with Palosi going and seeing China

reaction might like to go below $50,000." This suggested that Brown was managing the client's account, and made forecasts about the market which constituted investment advice.

21.     On August 2, 2022, when Beck Bode's principal Benjamin Beck asked Brown why a particular client seemed to have the impression that Brown would be trading in the client's account, Brown responded: "I still myself don't understand why I can't trade."

22.     On August 23, 2022, Brown wrote to numerous clients, asking them to choose five stocks they would like to buy from a list of stocks, then stating, "I am going to sell some small little stocks and replace." This again suggested that Brown was managing the clients' accounts.

23.     On September 22, 2022, Brown wrote to two clients: "Been crazy market so I have to focus on that. Love and thanks and if you want to come in tomorrow afternoon I'll call let me know I'll make time. Right now I'm trying to buy an inverse ETF on your account." Again, Brown held herself out as managing these clients' accounts and buying securities for them.

24.     On October 12, 2022, Brown wrote to another client laying out an investment strategy that she proposed to implement on the client's behalf, including: "I am hoping to raise some cash, do some short term 4% 1 year treasuries and sell off the small positions that are from old managers. I'd like to proceed today as we discussed if you approve. But now I just like to protect the account and then try to make some money later this year. Too much volatility to make any big bets right now."

25.     On October 26, 2022, Brown wrote to another client: "Beck bode has basically asked me not to give  investment advice but I am working on resolving that."

### Brown Disparages Beck Bode

26.     On August 8, September 28, and September 29, 2022, Beck Bode sent Brown drafts of a proposed communication to the Assigned Clients under the Succession Agreement, informing them of the transition of their accounts to Beck Bode, and that Brown was no longer providing investment advisory services but remaining involved as a consultant.

27.     On September 28 and September 29, 2022, Beck Bode informed Brown that the communication to the Assigned Clients would be sent "this week," i.e. on or before Friday, September 30, 2022.

28.     Brown did not respond with any suggested revisions to the draft. On September 30, 2022, Brown only stated that she had sent the draft to her lawyer and had not heard back.

29.     On or about 9/29/2022, Brown and Beck Bode's employee Angel Williams spoke on the phone regarding the draft email. Brown made some minor comments but did not suggest any substantive revisions. Brown agreed that sending the email served the interest of being fully transparent with clients.

30.     On October 4, 2022, Beck Bode sent the proposed email to the Assigned Clients on Brown's behalf from the email address carolann.brown@beckbode.com.

31.     Beginning October 4, 2022, in response to client inquiries about the email, Brown told numerous Assigned Clients that she did not send or authorize the email. She told at least one client that her name "was used fraudulently" on the email.

32.     During the following week, Brown continued to tell Assigned Clients: "That email did not come from me. I did not write it, send it or authorize it or have anything to do with it." She characterized the email several times as a "scam email."

33.     By contradicting Beck Bode's communication about the transition and referring to its actions as "fraudulent" and a "scam," Brown told the Assigned Clients that Beck Bode was not to be trusted.

34.     On October 10, 2022, one of the Assigned Clients wrote to Brown: "BB now has a credibility problem with me. We need to talk for sure."

35.     At various times, Brown also wrote to various Assigned Clients expressing dissatisfaction, frustration and making other negative remarks about Beck Bode, its relationship with Brown and/or its services to clients.

### Brown Solicits Beck Bode's Clients to Leave the Firm

36.     In an email exchange with a client who had expressed dissatisfaction with Brown and Beck Bode's handling of his account, Brown said nothing in defense of Beck Bode.

37.     Rather, Brown suggested that she would soon be leaving Beck Bode, and implied that she could continue to serve the client at another firm:

> I hate to have a great legal team and a great team in place now so I will no longer need Beckbody but you can't tell him that and I will probably be out of there soon. I guess I was upset because I tried so hard to move as I had a fidelity to Schwab because Ben told me you wanted to leave Fidelity and you wanted to be at Schwab… I'm so frustrated with bb -that's why I'm built a new team and will be working with Schwab instead. ..but please don't tell them that until at least next week."

### Clients Terminate their Relationships with Beck Bode

38.     As a result of Brown's conduct described above, many of the Assigned Clients have expressed concern or dissatisfaction with Beck Bode's services.

39.     As a result of Brown's conduct described above, many of the Assigned Clients decided to terminate their relationships with Beck Bode.

7

40.     As a result of the above and other performance issues, Beck Bode terminated Brown's employment on October 28, 2022.

## COUNT I
### Breach of Succession Agreement

41.     Beck Bode reasserts the allegations set forth in each of the foregoing paragraphs as though fully set forth herein.

42.     The Succession Agreement was a valid and binding contract between Beck Bode and Brown.

43.     By her conduct described above, including encouraging the Assigned Clients to discontinue their relationships with Beck Bode (including by way of direct solicitation and by her disparagement of Beck Bode) Brown has breached the Succession Agreement.

44.     Brown's breach of the Succession Agreement has caused damage to Beck Bode.

45.     The Succession Agreement provides that in the event of Brown's breach of the applicable non-solicitation restrictions, Beck Bode shall be entitled to monetary damages as well as equitable relief including preliminary and permanent injunctive relief.

46.     The Succession Agreement provides that in the event of Brown's breach of the applicable non-solicitation restrictions, in addition to the above-described monetary damages and equitable relief, Brown shall pay liquidated damages to Beck Bode.

WHEREFORE, Beck Bode, LLC, the Plaintiff herein, respectfully requests that this Court:

A.     Enter preliminary and permanent injunctive relief, including a temporary restraining order, requiring Brown to immediately cease violating the non-solicitation provisions of the Succession Agreement and to otherwise comply with the terms thereof;

B.     Award damages in an amount to be determined, together with such other amounts that may be available at law, including interest, costs and attorney's fees; and

8

C.      Grant such other and further relief as the Court deems just and appropriate.

## COUNT II
### Breach of Employment Agreement

47.     Beck Bode reasserts the allegations set forth in each of the foregoing paragraphs as though fully set forth herein.

48.     The Employment Agreement was a valid and binding contract between Beck Bode and Brown.

49.     By her conduct described above, including holding herself out as an investment adviser representative of Beck Bode, providing investment advice to clients, disparaging Beck Bode, and encouraging the Assigned Clients to discontinue their relationships with Beck Bode (including by way of direct solicitation and by her disparagement of Beck Bode), Brown has breached the Employment Agreement.

50.     Brown's breach of the Employment Agreement has caused damage to Beck Bode.

51.     The Employment Agreement provides that in the event of Brown's breach of the applicable non-solicitation restrictions, Beck Bode shall be entitled to monetary damages as well as equitable relief including preliminary and permanent injunctive relief.

52.     The Employment Agreement provides that in the event of Brown's breach of the applicable non-solicitation restrictions, in addition to the above-described monetary damages and equitable relief, Brown shall pay liquidated damages to Beck Bode.

53.     The Employment Agreement provides that if Brown's employment is terminated within three years, Beck Bode "may recoup any costs it incurred exclusively for your benefit and/or your office location, including, but not limited to, any upfront or startup costs such as costs incurred by the Company to purchase or lease equipment, furniture, signage, technology and software and similar costs that the Company incurred to outfit your office location (equipment,

9

furniture, signage, technology and software used to outfit your office location are referred to as 'Office Equipment'), and costs related to your transition and/or departure from the Company (including attorneys' fees and related costs)."

54.     The Employment Agreement provides that Brown:

> shall defend, indemnify and hold the Company and its affiliates, harmless from all obligations, costs, fees (including reasonable attorneys' fees), losses, liabilities, claims, judgments, actions, damages and expenses, including those at any time or from time to time paid, suffered, incurred or sustained by the Company which arise out of or are related to: (a) your breach of any representation, warranty, covenant or other obligation contained herein; (b) your alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty or any violation or alleged violations of any applicable law or applicable Company policies or procedures; (c) any activity by you outside the scope of your employment with the Company; and (d) any claim based on events occurring, or alleged to have occurred, prior to the date of this Agreement.

(Employment Agreement § 13.)

55.     The Employment Agreement provides that in any dispute arising out the Employment Agreement, "[t]he prevailing party shall be entitled to reimbursement of all costs and expenses including reasonable attorneys' fees, expert witness fees, arbitration fees and travel expenses from the losing party." (Employment Agreement § 14.)

WHEREFORE, Beck Bode, LLC, the Plaintiff herein, respectfully requests that this Court:

A.     Enter preliminary and permanent injunctive relief, including a temporary restraining order, requiring Brown to immediately cease violating the non-disparagement and non-solicitation provisions of the Employment Agreement and to otherwise comply with the terms thereof;

B.     Award damages in an amount to be determined, together with such other amounts that may be available at law, including interest, costs and attorney's fees; and

C.     Grant such other and further relief as the Court deems just and appropriate.

## COUNT III
### Defamation

56.     Beck Bode reasserts the allegations set forth in each of the foregoing paragraphs as though fully set forth herein.

57.     Brown's statements to clients that she had nothing to do with the client transition email, and characterizing Beck Bode's sending the email as "fraudulent" and a "scam" were untrue and defamatory.

58.     Brown's other negative statements to clients about Beck Bode, its relationship with Brown and/or its services to clients were untrue and defamatory.

59.     Brown knew at the time she made them that her above statements were false.

60.     Brown's false statements have damaged Beck Bode's business and reputation.

WHEREFORE, Beck Bode, LLC, the Plaintiff herein, respectfully requests that this Court:

A.      Enter preliminary and permanent injunctive relief, including a temporary restraining order, requiring Brown to immediately cease and desist from making any defamatory statements regarding Beck Bode, its business, personnel or operations;

B.      Award damages in an amount to be determined, together with such other amounts that may be available at law, including interest, costs and attorney's fees; and

C.      Grant such other and further relief as the Court deems just and appropriate.

## COUNT IV
### Breach of Fiduciary Duties

61.  Beck Bode reasserts the allegations set forth in each of the foregoing paragraphs as though fully set forth herein.

62.  Brown owed Beck Bode fiduciary duties in connection with the performance of her duties under the Succession Agreement and the Employment Agreement.

63. Brown's actions, as described above, including holding herself out as an investment adviser representative of Beck Bode, providing investment advice to clients, disparaging Beck Bode, and encouraging the Assigned Clients to discontinue their relationships with Beck Bode (including by way of direct solicitation and by her disparagement of Beck Bode), constitute breaches of her fiduciary duties to Beck Bode.

64. As a result of Brown's breaches of her fiduciary duties, Beck Bode has suffered damages.

WHEREFORE, Beck Bode, LLC, the Plaintiff herein, respectfully requests that this Court:

A.      Award damages in an amount to be determined, together with such other amounts that may be available at law, including interest, costs and attorney's fees; and

B.      Grant such other and further relief as the Court deems just and appropriate.

### COUNT V
**Tortious Interference With Contract and Business Relationships**

65. Beck Bode reasserts the allegations set forth in each of the foregoing paragraphs as though fully set forth herein.

66. Beck Bode enjoys advantageous business relationships and contractual relationships with its clients, including the clients it acquired from Brown. These clients are a source of actual and potential revenue.

67. Beck Bode had a reasonable expectation of keeping its advantageous business relationships and contractual relationships with its clients and to continue to benefit economically from these relationships.

68. Brown was aware of the business relationships and contractual relationships between Beck Bode and its clients and the economic benefit Beck Bode enjoyed from these relationships.

69. Brown's actions, as described above, including disparaging Beck Bode, and encouraging the Assigned Clients to discontinue their relationships with Beck Bode (including by way of direct solicitation and by her disparagement of Beck Bode), constitute interference with Beck Bode's contractual relationships and advantageous business relationships.

70. Brown's actions, as described above, were intentional or with wanton disregard for Beck Bode's rights and were committed with improper motive and by improper means.

71. As a result of Brown's tortious interference with Beck Bodes' contracts and advantageous business relationships, Beck Bode has suffered damages.

WHEREFORE, Beck Bode, LLC, the Plaintiff herein, respectfully requests that this Court:

A.      Enter preliminary and permanent injunctive relief, including a temporary restraining order, requiring Brown to immediately cease and desist from interfering with Beck Bode's contracts and advantageous business relationships;

B.      Award damages in an amount to be determined, together with such other amounts that may be available at law, including interest, costs and attorney's fees; and

C.      Grant such other and further relief as the Court deems just and appropriate.

Respectfully submitted,
Beck Bode, LLC
By its attorneys,

*/s/ J. Allen Holland*

_____

J. Allen Holland, Jr., BBO# 546892
David Glod, BBO# 676859
Rich May, P.C.
176 Federal Street, 6th Floor
Boston, MA 02110
(617) 556-3852
jaholland@richmaylaw.com
dglod@richmaylaw.com

November 8, 2022

14

# EXHIBIT A

### Business Succession Agreement

This Business Succession Agreement (this "**Agreement**"), dated as of March 28, 2022 (the "**Effective Date**"), is entered into by and between Carolann Brown, an individual residing at 224 Fischer Circle, Portsmouth, RI 02871 ("**Brown**"), and Beck Bode, LLC, a Massachusetts limited liability company having an address at 858 Washington Street, Suite 100, Dedham, MA 02026 ("**Beck Bode**").

**WHEREAS**, Beck Bode is a registered investment advisor providing investment advisory services to its clients; and

**WHEREAS**, Brown has developed a number of investment management client relationships (the "**Client Relationships**", and each such client, an "**Assigned Client**") set forth on Exhibit A hereto in her previous positions as an investment advisor representative; and

**WHEREAS**, Brown has agreed to assign all of her interests in the Assigned Clients and Client Relationships and recommends that they engage Beck Bode as their investment advisor;

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Assignment. As of the Effective Date, Brown hereby assigns and transfers unto Beck Bode, all of Brown's right, title and interest (including, without limitation, all goodwill) in, to and associated with each of the Clients and Client Relationships (the "**Assignment**").

2.     Payments.  In full and complete consideration of the Assignment (the "**Consideration**"), Beck Bode agrees to pay to Brown (or Brown's designee or representative) an amount equal to sixty percent (60%) of all net revenues received by Beck Bode from the Assigned Clients whose Client Relationships are transferred hereunder for a period of seven (7) years from the date hereof (the "**Payment Term**").  The Consideration shall be paid quarterly, within thirty (30) days of the end of each calendar quarter, subject to such withholdings as may be required by law.  The net revenues shall be determined by Beck Bode in accordance with its standard policies taking into account any and all expenses, refunds and any other appropriate adjustments.

3.     Communication with Assigned Clients.  Brown agrees to provide all reasonable assistance to Beck Bode in transitioning Assigned Clients including delivering communications developed by Beck Bode and acceptable to Brown with respect to introducing Brown and providing such other information as determined by Brown from time to time.

4.     Non-Solicitation.

(a)  As used herein, "**Confidential Information**" means all information, knowledge, data, specialized training, trade secrets or other information that derives actual or potential value from the fact that it is not generally known to members of the public, which concerns the business or affairs of Beck Bode, including but not limited to all information with respect to Beck Bode clients. Brown acknowledges that Confidential Information provides Beck Bode with a competitive advantage (or could be used by a competitor to Beck Bode's disadvantage) because it is not generally known by persons not employed by Beck Bode and cannot be easily learned or determined by persons outside Beck Bode. Brown acknowledges that Beck Bode has a compelling business interest in preventing

the use or disclosure of Confidential Information in the event that, Brown goes to work for or become affiliated with a competitor of Beck Bode or otherwise engage in business activities that are competitive with Beck Bode's.

(b)  Brown acknowledges that all clients are clients of Beck Bode, and not Brown's personally, and were obtained, developed and maintained for Beck Bode's benefit and through Beck Bode's financial and other support.  Brown further acknowledge that, by virtue of any employment with Beck Bode, Brown may gain knowledge of the identity, characteristics and preferences of clients and prospective clients for whom Beck Bode's employees performed services that are special, unique and extraordinary, and that Brown would inevitably have to draw on Confidential Information if Brown were to solicit or service such clients or prospective clients on behalf of a competing business enterprise.

(c)  Accordingly, during the Payment Term (referred to in this Section as the "**Non-Solicitation Period**"), Brown agrees that she will not, in any manner, directly or indirectly, Solicit (as defined below) any client or prospective client of Beck Bode's, or otherwise interfere with or damage (or attempt to do either) any relationship between Beck Bode and any such client or prospective client, person or entity.

(d)  For all purposes hereunder, "**Solicit**" (including the terms "**Solicitation**", "**Soliciting**" and other derivations of such term) shall mean directly or indirectly contacting or communicating in any manner with clients or prospective clients, whether orally, in person, electronically, telephonically, in writing or otherwise, with the intent or where the effect is to influence or facilitate in any degree, induce or cause any client or prospective client to: (i) transfer business (*e.g.* assets) or business relationships from Beck Bode to Brown or any other person or entity; (ii) obtain services similar to those provided by Beck Bode or its affiliated from Beck Bode or any other person or entity; (iii) open with Brown or any other person or entity an investment advisory, investment management, insurance, asset management or brokerage account or relationship; or (iv) otherwise discontinue or diminish a business or financial relationship with Beck Bode. Nothing herein shall be deemed to prevent the acceptance of any business from any client or prospective client or to otherwise interfere with the transfer of any account pursuant to the direction of any client, provided that Brown acknowledges and agrees that Beck Bode may be entitled to seek damages or other legal or equitable remedies from Brown as set forth further herein if such acceptance of client business or account transfer arose out of Brown's breach of this Agreement or any of the terms and conditions hereof.

(e)  Brown agrees that during the Non-Solicitation Period, Brown will not Solicit or induce any employee, consultant, agent or service provider of Beck Bode to leave or cease their affiliation or other business relationship with Beck Bode, or to diminish their business relationship with Beck Bode.

(f)  Brown acknowledges that the restrictive covenants set forth in this Section 4 are independent of any other provisions of this Agreement. The existence of any claim or cause of action Brown may have against Beck Bode, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Beck Bode of any such covenants. Brown further acknowledges and agrees that the provisions of this Section 4 are reasonable in scope and duration to protect the

legitimate business interests of Beck Bode, and that Beck Bode would not this Agreement and pay the Consideration without such terms and conditions.

(g) For the purposes of clarity, the terms and conditions of this Section 4 and Section 5 below shall be in addition to supersede any conflicting provisions set forth in any other agreement between the parties.

5. Remedies for Breaches of Section 4.

(a) Brown acknowledges that the restrictions on Brown's ability to Solicit Beck Bode's clients and prospective clients, and on Brown's ability to Solicit or otherwise enter into dealings with current and former employees, consultants, agents or service providers contained in this Agreement, are fair, reasonable and necessary for the protection of Beck Bode's legitimate business interests and that Beck Bode will suffer irreparable harm in the event of any actual breach of the provisions containing these restrictions by Brown. In the event of a proven breach of all or any portion of Section 4 of this Agreement, Brown agrees that in addition to any other remedies or relief to which Beck Bode may be entitled, including other equitable relief and monetary damages, Brown consents to the issuance of a temporary restraining order, a preliminary injunction and a permanent injunction or final award ordering, among other things: (i) that Brown immediately cease violating the provisions of this Agreement; (ii) that Brown immediately return to us all Confidential Information and all Beck Bode's property in any form whatsoever and that Brown be enjoined from using or disclosing any such information and/or property; (iii) that for a period of twelve (12) months, or the remainder of the Non-Solicitation Period, whichever is longer, Brown be enjoined and restrained from Soliciting any client or prospective client of Beck Bode, or otherwise interfering with or damaging (or attempting to do either) any relationship between Beck Bode and any such client, person or entity; and (iv) that for a period of twelve (12) months, or the remainder of the Non-Solicitation Period, whichever is longer Brown be enjoined and restrained from Soliciting, hiring or seeking to hire (whether on Brown's own behalf or on behalf of some other person) any person who was, at the time of the termination of your employment, an employee, consultant, agent or service provider of Beck Bode or who had left Beck Bode's employ or other business relationship within six months prior thereto, or otherwise interfering with or damaging (or attempting to do either) any relationship between Beck Bode and any such person or entity. Brown acknowledges and agrees that she will indemnify and hold Beck Bode harmless against any and all proven losses suffered by Beck Bode as a result of Brown's violation of all or any portion of Section 4 hereof.

(b) Notwithstanding the foregoing, in the event that Brown breach the non-solicitation provisions of this Agreement, and any client or prospective client of Beck Bode becomes Brown's client or a client of any entity or individual providing investment advisory or brokerage services where Brown is employed or affiliated as an investment advisor representative or consultant or from which Brown receives compensation, directly or indirectly, within the Non-Solicitation Period (a "**Transferred Client**"), Brown acknowledges and agrees that Brown shall, in addition to all other remedies at law and in equity available to Beck Bode, pay to Beck Bode all payments previously received by Brown pursuant to Section 4, if any, and forfeit the right to receive any remaining amounts payable under that section, and pay to Beck Bode "Lost Revenue" attributable to the Transferred Client as compensation for the loss of such Transferred Client. For the purposes of this Section 5(b), the term "Lost Revenue" shall mean two times (2X) the product of (i) the trailing twelve (12) month gross

3

revenues generated by any such Transferred Client times (ii) the number of years remaining in the Non-Solicitation Period (rounded up to the nearest whole year and determined for these purposes without consideration of the forfeiture of any payments under Section 4). Lost Revenue shall be paid in three (3) equal installments each twelve (12) months apart, together with interest at the rate published from time to time by *The Wall Street Journal* as the prime lending rate plus 2%, with the first installment paid within thirty (30) days from the departure of the Transferred Client.

5.      Miscellaneous.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Agreement delivered by either facsimile or email shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment. Notwithstanding the foregoing, each party hereto shall deliver original counterpart signatures to the other parties on or before the date hereof.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to conflict of law rules.  This Agreement may not be modified or amended in any manner other than by a written agreement signed by the party to be charged.  Brown shall promptly execute and deliver to Beck Bode any additional instrument or other document which Beck Bode reasonably requests to evidence or better effect the assignment contained herein.  This Agreement and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE PAGE FOLLOWS]

4

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first stated above.

ASSIGNOR

Carolann Brown

ASSIGNEE

Beck Bode, LLC

By_____

Name: Benjamin Beck

Title: Manager

5

## SCHEDULE A

### ASSIGNED CLIENTS

# EXHIBIT B

# Beck Bode, LLC

March 28, 2022

Ms. Carolann Brown
224 Fischer Circle
Portsmouth RI  02871
(401) 965-5267

Dear Carolann:

This amended and restated employment agreement (this "Agreement"), dated and effective as of the date first written above (the "Effective Date"), will confirm our understanding with respect to the terms and conditions of your ("you") employment by Beck Bode, LLC ("Beck Bode" or the "Company" or "we" or "us"), mailing address 858 Washington St Ste 100, Dedham, MA 02026.

## RECITALS

WHEREAS, the Company and you entered into an employment agreement on December 30, 2021 (the "Original Agreement"); and

WHEREAS, the Company and you now wish to amend and restate the Original Agreement in its entirety.

NOW THEREFORE, the parties hereto agree as follows:

## 1.  DUTIES

(a)   Commencing the Effective Date, you will be employed as a Senior Client Consultant.  Your duties will include helping clients in their transition to the Company, providing background information on such clients and their historical needs and such other matters that may be assigned to you by the Company.  You will report to Benjamin Beck.

(b)   For the avoidance of doubt, as of the Effective Date, you will not be employed as an Investment Advisor Representative ("IAR") of the Company, and your duties will not include any services which would require you to be registered as an IAR with the Securities and Exchange Commission ("SEC") or any state regulatory authority, including, but not limited to, making trades on behalf of clients or providing any discretionary or non-discretionary investment services to clients.  From and after the Effective Date, you agree that you will not hold yourself out as an IAR and will otherwise abide by the laws and rules of all governmental, regulatory and self-regulatory entities that govern our and your activities, as well as all Company policies and procedures as may be promulgated from time to time.

(c)   This is a full-time position. You will be expected to devote substantially all of your attention and time during your working hours to the business and affairs of the Company and use your best efforts to perform faithfully and efficiently such responsibilities. While you are rendering services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company.

(d)   You will have access to Beck Bode's administrative staff.

1

## 2. COMPENSATION

Commencing on the Effective Date, you will be paid a salary pursuant to the Company's regular payroll cycle at an annual rate of $36,000 per year. You agree that you have received all compensation and benefits due to you prior to the Effective Date and, as of the Effective Date, you have no claims against the Company with respect thereto or otherwise involving your prior employment with the Company.

## 3. EMPLOYEE BENEFITS

As a regular employee of the Company you will be eligible to participate in a number of Company-sponsored benefits as such benefits are in effect from time to time.

## 4. AT-WILL EMPLOYMENT

You are an at-will employee of the Company, which means the employment relationship can be terminated by either party for any reason at any time.  Any statements or representations to the contrary (and any statements contradicting any provision in this Agreement) should be regarded by you as ineffective. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed by an express written agreement signed by you and the Company. Further, your participation in any benefit program is not to be regarded as assuring you of continuing employment for any particular period of time.

## 5. AUTHORIZATION TO WORK

Due to Federal regulations adopted in the Immigration Reform and Control Act of 1986, if requested by the Company, you will present documentation demonstrating that you have authorization to work in the United States. If you have any questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, please contact me as soon as possible.

## 6. INTENTIONALLY LEFT BLANK

## 7. CONFIDENTIALITY

(a)          During your employment with us, you will have access to certain non-public and other proprietary information of ours and our affiliates and other companies from which we receive non-public and confidential information (collectively, "Confidential Information", as more fully defined below). You acknowledge that the Company's continued operations and success in the investment advisory, investment management, financial planning, insurance and all other related financial services business activities are dependent upon Confidential Information of the Company, and you acknowledge that the Company's Confidential Information is a valuable, special and unique asset of the Company. You further acknowledge and agree that the Company's continued operations and success in its business activities is dependent upon the Company's continuing relationships with, and knowledge about, clients and prospective clients and the goodwill those relationships create.

(b) As used herein, "Confidential Information" means information, knowledge, data, specialized training, trade secrets or other information that derives actual or potential value from the fact that it is not generally known to members of the public, which concerns the business or affairs of the Company and which you have or will receive or develop, in whole or in part, as a direct or indirect result of your relationship with the Company or through the use of the Company's facilities and resources. For all purposes herein, "Confidential Information" includes, but is not limited to:

(i) the names, addresses, telephone numbers, email addresses, facsimile numbers, and other information concerning the assets, accounts or the financial affairs of the Company's clients and prospective clients;

2

(ii) information concerning our products and the investment strategies used for our clients, investment processes, models, existing and expected trading and investment activities, computer programs, databases and algorithms, methods of classifying and operating client accounts, compliance and supervision activities, and relationships with regulators and self-regulatory organizations;

(iii) information concerning our and our affiliates' business, financial affairs, marketing plans, service provider relationships, and strategies and operating procedures;

(iv) information regarding acquisitions, mergers, business combinations, and strategic alliances; the identity of prospective acquisition candidates, financing and prospective financing sources;

(v) information concerning personnel matters such as the identity of employees and advisors and prospective employees and advisors, the terms and conditions of their affiliation and compensation, organizational responsibilities, and their personal affairs;

(vi) any other materials or information related to our businesses or activities or personnel which are not generally known to others engaged in similar businesses or activities or which could not be gathered or obtained without significant expenditure of time, effort and money;

(vii) all inventions and ideas which are derived from or relate to your access to or knowledge of any of the above enumerated materials and information; and

(viii) the terms of this Agreement.

(c)  Confidential Information shall not include information which you can demonstrate with tangible evidence that (i) you have independently developed or conceived without the use of Confidential Information, (ii) is publicly available or becomes publicly available other than as a result of a disclosure by you in violation of this Agreement, and (iii) was already in your possession or known to you prior to being disclosed or provided to you by the Company, provided, however, that to the best of your knowledge, the source of such information or material was not aware of a contractual, legal or fiduciary obligation of confidentiality to the Company or its affiliates with respect thereto or was or is obtained by you or a third party who, to the best of your knowledge, did not obtain such information by virtue of a breach of confidentiality obligation to the Company or its affiliates.

(d)  All Confidential Information, including but not limited to Confidential Information you may develop, conceive, produce, prepare, use, construct and/or observe, is and shall remain the sole and exclusive property of the Company or its affiliates.

(e)  <u>Non-Disclosure.</u> In exchange for our agreement and promise to provide you with access or continuing access to Confidential Information, during your employment with the Company and at all times thereafter, you (i) shall use Confidential Information strictly for our benefit and only for the purposes we intend, authorize and direct; and (ii) you will hold Confidential Information in strict confidence, and except as otherwise directed by us, you will not directly or indirectly use Confidential Information for any purpose and will not directly or indirectly disclose Confidential Information outside of the Company.

(i)  Upon termination of your employment (or earlier if we request it) you will immediately return to us all originals and copies of documents or other materials, whether in hard copy or found on computer or other electronic storage media, containing or which were derived from or including Confidential Information. To the extent any Confidential Information may exist or be stored in electronic equipment in your custody or control not issued by us to you, you will promptly delete all such documents or other materials on your electronic equipment. If requested by us, you will provide us with a certificate signed by you and satisfactory to us to the effect that all Confidential Information has been returned or deleted.

(ii)  [Reserved]

(iii)  Nothing contained in this Section 7 shall prevent you from disclosing Confidential Information: (i) as required by applicable law or on the order of any court or administrative agency; (ii) on the request or demand in writing of any regulatory agency or authority having jurisdiction over you or the Company; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy

3

hereunder, provided you take reasonable steps to preserve its confidential status; (v) with respect to the terms of this Agreement only, to your financial advisor, accountant, and/or attorney, provided that you first inform them in writing of the confidentiality of the terms of this Agreement and take reasonable steps to present and protect its confidential status. In the case of clauses (i), (ii) or (iii) of this paragraph, you shall notify (unless such notice is prohibited by applicable law, rules, regulations or legal or regulatory process or unless such disclosure is required pursuant to routine or periodic regulatory examinations) the Company in writing as far in advance of such disclosure as practicable and (but, to the extent legally permissible, in no event make any such disclosure before notifying the Company) use reasonable efforts at the cost and expense of the Company to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(f) Nothing in this Agreement prohibits you from reporting possible violations or federal law or regulation to any governmental agency or entity, including but not limited to the U.S. Department of Justice, the U.S. Securities and Exchange Commission, the U.S. Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. The Company acknowledges and agrees that you do not need the prior authorization of the Company to make any such reports or disclosures and you are required to notify the Company that it may make or has made such reports or disclosures.

## 8. NON-SOLICITATION

(a) You acknowledge that Confidential Information provides us with a competitive advantage (or could be used by a competitor to our disadvantage) because it is not generally known by persons not employed by us and cannot be easily learned or determined by persons outside the Company. You acknowledge that we have a compelling business interest in preventing the use or disclosure of Confidential Information in the event that, after the termination of your employment with us, you go to work for or become affiliated with a competitor of ours or otherwise engage in business activities that are competitive with ours.

(b) You acknowledge that all our clients are clients of the Company, and not yours personally, and were obtained, developed and maintained for our benefit and through our financial and other support. You further acknowledge that, by virtue of your employment with us, you may gain knowledge of the identity, characteristics and preferences of clients and prospective clients for whom you or our employees performed services that are special, unique and extraordinary, and that you would inevitably have to draw on Confidential Information if you were to solicit or service such clients or prospective clients on behalf of a competing business enterprise.

(c) Accordingly, during your employment with us, and for a period of twelve (12) months following termination of employment, for any reason (the "Non-Solicitation Period"), you agree that you will not, in any manner, directly or indirectly, Solicit (as defined below) any client or prospective client of ours to whom you provided services or whom you contacted for the purpose of developing business for us or whose name became known to you while you were employed by the Company, or otherwise interfere with or damage (or attempt to do either) any relationship between us and any such client or prospective client, person or entity.

(d) For all purposes hereunder, "Solicit" (including the terms "Solicitation", "Soliciting" and other derivations of such term) shall mean directly or indirectly contacting or communicating in any manner with clients or prospective clients, whether orally, in person, electronically, telephonically, in writing or otherwise, with the intent or where the effect is to influence or facilitate in any degree, induce or cause any client or prospective client to: (i) transfer business (*e.g.* assets) or business relationships from us to you or any other person or entity; (ii) obtain services similar to those provided by the Company or its affiliated from you or any other person or entity; (iii) open with you or any other person or entity an investment advisory, investment management, insurance, asset management or brokerage account or relationship; or (iv) otherwise discontinue or diminish a business or financial relationship with us. Nothing herein shall be deemed to prevent the acceptance of any business from any client or prospective client or to otherwise interfere with the transfer of any account pursuant to the direction of any client, provided that you acknowledge and agree that the Company may be entitled to seek damages or other legal or equitable remedies from you as set forth further herein if such

4

acceptance of client business or account transfer arose out of your breach of this Agreement or any of the terms and conditions hereof.

(e)   [Reserved].

(f)   You agree that during the Non-Solicitation Period, you will not Solicit or induce any employee, consultant, agent or service provider of ours to leave or cease their affiliation or other business relationship with us, or to diminish their business relationship with us, whether based on Confidential Information you learned about such employee, consultant, agent or service provider while you were employed by us or otherwise.

(g)   You acknowledge that the restrictive covenants set forth in this Section 8 are independent of any other provisions of this Agreement. The existence of any claim or cause of action you may have against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any such covenants. You further acknowledge and agree that the provisions of this Section 8 are reasonable in scope and duration to protect the legitimate business interests of the Company, and that the Company would not offer or continue to employ you absent your agreement with such terms and conditions.

## 9.   REMEDIES FOR BREACHES OF SECTIONS 7 AND 8

(a)   You acknowledge that the restrictions on your use of Confidential Information, on your ability to Solicit our clients and prospective clients, and on your ability to Solicit or otherwise enter into dealings with current and former employees, consultants, agents or service providers contained in this Agreement, are fair, reasonable and necessary for the protection of our legitimate business interests and that we will suffer irreparable harm in the event of any actual breach of the provisions containing these restrictions by you. In the event of a proven breach of all or any portion of Section 7 or Section 8 of this Agreement, you agree that in addition to any other remedies or relief to which we may be entitled, including other equitable relief and monetary damages, you consent to the issuance of a temporary restraining order, a preliminary injunction and a permanent injunction or final award ordering, among other things: (i) that you immediately cease violating the provisions of this Agreement; (ii) that you immediately return to us all Confidential Information and all our property in any form whatsoever and that you be enjoined from using or disclosing any such information and/or property; (iii) that for a period of twelve (12) months, or the remainder of the Non-Solicitation Period, whichever is longer, you be enjoined and restrained from Soliciting any client or prospective client of ours to whom you provided services or whom you contacted for the purpose of developing business for us or whose name became known to you while you were in our employ, or otherwise interfering with or damaging (or attempting to do either) any relationship between us and any such client, person or entity; and (iv) that for a period of twelve (12) months, or the remainder of the Non-Solicitation Period, whichever is longer you be enjoined and restrained from Soliciting, hiring or seeking to hire (whether on your own behalf or on behalf of some other person) any person who was, at the time of your termination, an employee, consultant, agent or service provider of ours or who had left our employ or other business relationship within six months prior thereto, or otherwise interfering with or damaging (or attempting to do either) any relationship between us and any such person or entity. You acknowledge and agree that you will indemnify and hold us harmless against any and all proven losses suffered by us as a result of your violation of all or any portion of Section 7 and Section 8 hereof.

(b)   Notwithstanding the foregoing, in the event that you breach the non-solicitation provisions of this Agreement, and any client or prospective client of ours becomes your client or a client of any entity or individual providing investment advisory or brokerage services where you are employed or affiliated as an investment advisor representative or consultant or from which you receive compensation, directly or indirectly, within the Non-Solicitation Period (a "Transferred Client"), you acknowledge and agree that you shall, in addition to all other remedies at law and in equity available to the Company, pay to the Company all payments previously received by you pursuant to Section 6(a), if any, and forfeit the right to receive any remaining amounts payable under that section, and pay to the Company "Lost Revenue" attributable to the Transferred Client as compensation for the loss of such Transferred Client. For the purposes of this Section 9(c), the term "Lost Revenue" shall mean two times (2X) the product of (i) the trailing twelve (12) month gross revenues generated by any such Transferred Client times (ii) the number of years remaining in the Non-Solicitation Period (rounded up to the nearest whole year and determined for these purposes without consideration of the forfeiture of any payments under Section 6(a)). Lost Revenue shall be paid in three (3) equal installments each twelve (12) months

5

apart, together with interest at the rate published from time to time by *The Wall Street Journal* as the prime lending rate plus 2%, with the first installment paid within thirty (30) days from the departure of the Transferred Client.

## 10.  NON-DISPARAGEMENT

You shall at no time, during your employment or at any time thereafter, engage in conduct or communication, directly or indirectly, which injures, harms, corrupts, demeans, defames, disparages, libels, slanders, destroys or diminishes in anyway the reputation or goodwill of the Company, its clients and prospective clients, its affiliates, or the Company's and its affiliates' respective employees, consultants, agents or service providers. The Company shall at no time, during your employment or at any time thereafter, engage in conduct or communication, directly or indirectly, which injures, harms, corrupts, demeans, defames, disparages, libels, slanders, destroys or diminishes in any way your reputation or goodwill.

## 11.  TERMINATION

(a)     Without limiting any right of the Company pursuant to Section 4, the Company shall have the right to immediately terminate this Agreement, upon written notice to you, or, if applicable, your Representative, in the event of: (i) your death; (ii) your incapacity or disability which renders you unable to perform the duties and services contemplated by this Agreement; (iii) your commission of an act of fraud, dishonesty or embezzlement; (iv) your neglect in the performance of the duties and services contemplated by this Agreement; (v) your violation of the law or other regulation governing the investment industry (i.e., SEC regulations, etc.); or (vi) your breach of any of your covenants or obligations under this Agreement.

(b)     You understand and agree that by virtue of your position, you will be privy to our Confidential Information and valued client relationships. You recognize and agree that it is reasonable and necessary for us to protect the Confidential Information and to provide for a smooth transition in the event you choose to terminate your employment with the Company. Consequently, in the event of your resignation, you agree to provide us with at least 30 days' prior written notice of your intent to terminate your employment with us.

(c)     Upon termination: (i) you shall immediately deliver to the Company all funds, property records and supplies of every kind belonging to the Company in your possession or control, including documents, notebooks, files, memoranda, letterhead, business cards, data, reports, client lists and potential client lists and any Confidential Information, whether on paper or stored electronically or otherwise; and (ii) you shall cease holding yourself out as an employee of, or affiliated in any way with, the Company.

(d)     Upon your termination, the Company, in its discretion, may recoup any costs it incurred exclusively for your benefit and/or your office location, including, but not limited to, any upfront or startup costs such as costs incurred by the Company to purchase or lease equipment, furniture, signage, technology and software and similar costs that the Company incurred to outfit your office location (equipment, furniture, signage, technology and software used to outfit your office location are referred to as "Office Equipment"), and costs related to your transition and/or departure from the Company (including attorneys' fees and related costs), unless otherwise agreed herein. After your third year of continuous employment with the Company, the Company agrees not to seek to recoup costs incurred by the Company for Office Equipment purchased in the first three years of your employment with the Company. All Office Equipment purchased by the Company shall remain the property of the Company upon the termination of your employment with the Company.

(e)     Upon termination of your employment from the Company, you are responsible for any remaining financial obligations on leases for equipment, furniture, signage, technology equipment and software leased by the Company to outfit your office location ("Remaining Financial Obligations").

(f)     The fees and/or costs that the Company is entitled to recoup pursuant to this Agreement will be deducted from your final revenue payment. If final revenue payment does not cover these costs/fees, you will pay Company the balance within ten calendar days. Any compensation paid in advance to you shall immediately be repaid to Company within 3 calendar days of termination so that Company can reimburse clients. Failure to do so will subject you to a 10%, penalty on the amount you have not repaid every 5 calendar days, or (if such penalty amount is found to be legally impermissible) the highest amount of interest permitted by applicable law.

6

## 12. REPRESENTATIONS AND WARRANTIES

You represent, warrant and covenant that:

(a) you will maintain the highest standards of honesty and fair dealing in your work for and on behalf of the Company;

(b) you possess and will maintain all licenses, registrations, certifications, permits and qualifications necessary to perform your duties hereunder and that you are not subject to any action, any statutory or other disqualification or limitation set forth in the Securities Act of 1933, the Securities Exchange Act of 1934 or the Investment Advisors Act of 1940 or any of the rules or regulations promulgated by the SEC or applicable state regulatory authorities or self-regulatory organizations;

(c) by performing your duties hereunder, you will not breach any agreement or obligation to not disclose Confidential Information, including but not limited to, client lists, trade secrets or any agreement regarding any former employer, and your employment with the Company does not breach or conflict with any non-solicitation agreement or restrictive covenant of any kind to which you may be subject or to which you are a party;

(d) To the extent that you engage in solicitation or referral activities within Rule 206(4)-3 under the Investment Advisers Act of 1940, this Agreement will constitute the written agreement required by Rule 206(4)-3 and you or will disclose your status as an employee of the Company who receives compensation from the Company for your services, including such solicitation activities, to the applicable client at the time of the initial solicitation or as such referral activities take place with respect to the client.  The foregoing notwithstanding, you shall not engage in any solicitation or referral activities on behalf of the Company or otherwise without the express prior permission of the Company in each instance;

(e) you will promptly notify the Company upon the occurrence of any event of which you have actual knowledge that such event might disqualify, prevent or limit you from performing your responsibilities for the Company as contemplated under this Agreement;

(f) you will notify the Company immediately if any representation in this Section 12 ceases to be true and accurate for any reason; and

(g) you have the full right, power and authority to execute and deliver this Agreement and to perform your obligations hereunder, and that this Agreement constitutes valid and legally binding obligations enforceable against you in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the enforcement of creditors' rights generally, now or hereafter in effect and subject to the application of equitable principles and the availability of equitable remedies.

## 13. INDEMNIFICATION

You shall defend, indemnify and hold the Company and its affiliates, harmless from all obligations, costs, fees (including reasonable attorneys' fees), losses, liabilities, claims, judgments, actions, damages and expenses, including those at any time or from time to time paid, suffered, incurred or sustained by the Company which arise out of or are related to: (a) your breach of any representation, warranty, covenant or other obligation contained herein; (b) your alleged or actual errors, omissions, negligence, intentional wrongdoing, breach of duty or any violation or alleged  violations of  any applicable law or applicable Company policies or procedures; (c) any activity by you outside the scope of your employment with the Company; and (d) any claim based on events occurring, or alleged to have occurred, prior to the date of this Agreement. If you fail to comply with the laws and rules of governmental, regulatory and self-regulatory entities that govern our and your activities, as well as all Company policies and procedures, the Company shall have the right, exercisable in its sole discretion, to assess against and collect from you such sums as the Company reasonably deems appropriate in furtherance of its right of indemnification specified herein.

## 14. ARBITRATION

Any claim, controversy or dispute between you and us arising out of this Agreement shall be resolved by a single arbitrator in accordance with the rules and regulations of the American Arbitration Association. Any award by such arbitrator shall be final and not subject to appeal and judgment upon the award may be entered in any court having jurisdiction. The prevailing party shall be entitled to reimbursement of all costs and expenses including reasonable attorneys' fees, expert witness fees, arbitration fees and travel expenses from the losing party. Costs, expenses and awards may be offset against any compensation or commissions due to you. The location of the arbitration shall be in the Commonwealth of Massachusetts unless otherwise designated by the Company. This arbitration provision shall not, however, prevent us from seeking injunctive or other provisional relief from any court of competent jurisdiction.

**15.  NOTICE OF IMMUNITY UNDER THE ECONOMIC ESPIONAGE ACT OF 1996, AS AMENDED BY THE DEFEND TRADE SECRETS ACT OF 1016.**

Notwithstanding any other provision of this Agreement to the contrary: (a) you will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made; (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation or law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and (b) if you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you (x) file any document containing the trade secret under seal and (y) does not disclose the trade secret, except pursuant to court order.

**16.  MISCELLANEOUS**

(a)     **Titles and Subtitles.** Titles of the Sections, paragraphs and subparagraphs are placed herein for convenient reference only and shall not to any extent have the effect of modifying, amending, or changing the express terms and provisions of this Agreement.

(b)     **Waiver.** No consent or waiver, express or implied, by either party to this Agreement to or of any breach or default by any other party in the performance by any other party of its obligations under this Agreement shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other party of the same or any other obligation of such party under this Agreement. Failure on the part of a party to complain of any act or failure to act of any other party or to declare such other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights under this Agreement.

(c)     **Entire Agreement.** This Agreement contains the entire agreement between us relating to the subject matter hereof and supersedes all prior oral and written understandings relating to such subject matter, including without limitation, the Original Agreement. No variations, modifications or changes herein nor any waiver of any provision of this Agreement shall be binding unless set forth in a document duly executed by parties hereto.

(d)     **Severability.** Each provision of this Agreement is severable and independent of every other provision of this Agreement. In the event that any provision of this Agreement is held invalid by an arbitration panel or court of competent jurisdiction because of its duration, scope of area, or activity, or any other reason, the parties agree that such covenant shall be adjusted or modified by the court or arbitrator to the extent necessary to cure that invalidity, and the modified covenant shall thereafter be enforceable as if originally made in this Agreement.

(e)     **Binding Agreement.** You may not assign this Agreement under any circumstances. The Company shall be permitted to assign the Agreement in its discretion provided that the assignee agrees to assume this Agreement in writing or the Agreement is automatically assigned and assumed by process of law. This Agreement shall inure to the benefit and be binding upon the legal representatives, executors, administrators, successors, heirs, distributes, devisees, legatees and permitted assignees of the parties. None of the provisions of this Agreement is intended to be, not shall the provisions be construed to be, for the benefit of any third party.

(f)     **Sophistication of Parties.** Each of the parties hereto: (i) is sophisticated in negotiating business transactions; (ii) is, or has had the opportunity to be and is elected not to be, represented by counsel; (iii)

8

has reviewed each of the provisions in this Agreement carefully; and (iv) has negotiated or has had full opportunity to negotiate the terms of this Agreement.

(g) **Surviving Terms:** Sections 6 through 16 of this Agreement shall survive the termination of this Agreement.

(h) **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without regard for any conflict of law rules or principles that would require the application of the laws of any other jurisdiction. Notwithstanding the foregoing, for all relief not subject to arbitration, you hereby irrevocably submit to the jurisdiction of any state court or federal court in the Commonwealth of Massachusetts in any such suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction or occurrence in the Commonwealth of Massachusetts. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

(i) **Counterparts.** This Agreement may be executed in one or more counterparts with each such counterpart deemed to be an original of this Agreement and all such counterparts deemed to be one and the same Agreement. Facsimile, portable document format (pdf) and similar means of electronic signature delivery shall have the same force and effect as originals.

9

In witness whereof, the parties hereto have executed this Agreement as of the date first above written.

Beck Bode, LLC

By: _____

Name: _____

Title: _____

Carolann Brown

10