# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **BECK BODE, LLC,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. No.: 1-22-cv-12084-ADB** |
| | : | |
| **CAROLANN BROWN,** | : | |
| **Defendant** | : | |

## DEFENDANT'S ANSWER TO COMPLAINT

Now comes the Defendant, Carolann Brown ("Brown"), in the above-cited matter and does hereby answer Plaintiff's Complaint (the "Complaint") as follows:

1.      The Defendant admits the allegation contained in paragraph 1 of the Complaint.

2.      The Defendant admits the allegation contained in paragraph 2 of the Complaint.

3.      The Defendant admits the allegations contained in paragraph 3 of the Complaint.

4.      The Defendant admits that she has worked as an investment adviser representative of several investment advisory firms, developing a book of business and various client relationships, but denies the remainder of the allegations contained in paragraph 4 of the Complaint.

5.      The Defendant admits that she was approximately 75 years-old in the fourth quarter of 2021, but denies the remainder of the allegations as stated in paragraph 6 of the Complaint.

6.      The Defendant denies the allegations as stated in paragraph 6 of the Complaint.

7.      The Defendant denies the allegations as stated in paragraph 7 of the Complaint.

8.      The Defendant admits that she executed a Business Succession Agreement (the "Succession Agreement") on March 28, 2022 as alleged in paragraph 8 of the Complaint, but further states that the Succession Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Succession Agreement, and  that the Defendant

signed the Succession Agreement under duress. To the extent that the Plaintiff relies of the language of the Succession Agreement, the language of the document speaks for itself.

9. The Defendant denies the allegations contained in paragraph 9 of the Complaint, incorporates by reference her response to paragraph 8 of the Complaint above and further states that the Plaintiff failed to designate any of the so-called "Assigned Clients" under the Succession Agreement and/or failed to list these "Assigned Clients" in <u>Schedule A</u> of the Succession Agreement.

10. The Defendant states that the language of the Succession Agreement speaks for itself, states that the Succession Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Succession Agreement, and that the Defendant signed the agreement under duress and otherwise denies the allegations of paragraph 10.

11. The Defendant admits that she executed an Employment Agreement (the "Employment Agreement") on March 28, 2022 as alleged in paragraph 11 of the Complaint, but further states that the Employment Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Employment Agreement, and that the Defendant signed the Employment Agreement under duress. To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself.

12. The Defendant admits the allegations as stated in paragraph 12 of the Complaint accurately quotes the language of the Employment Agreement, which speaks for itself.

13. The Defendant admits the allegations as stated in paragraph 13 of the Complaint accurately quote the language of the Succession Agreement, but further states that the Succession Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Succession Agreement, and that the Defendant signed the Succession Agreement under

duress. To the extent that the Plaintiff relies of the language of the Succession Agreement, the language of the document speaks for itself.

14. The Defendant admits the allegations as stated in paragraph 14 of the Complaint accurately quote the language of the Employment Agreement, but further states that the Employment Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Employment Agreement, and that the Defendant signed the Employment Agreement under duress. To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself.

15. The Defendant admits the allegations as stated in paragraph 15 of the Complaint accurately quote the language of the Succession Agreement, but further states that both the Succession Agreement and the Employment Agreement are invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Succession Agreement and the Employment Agreement, and that the Defendant signed the agreements under duress. To the extent that the Plaintiff relies of the language of the Succession Agreement and Employment Agreement, the language of the document speaks for itself.

16. The Defendant admits the allegations as stated in paragraph 16 of the Complaint accurately quote the language of the Employment Agreement, but further states that the Employment Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Employment Agreement, and that the Defendant signed the Employment Agreement under duress. To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself.

17. The Defendant admits the allegations as stated in paragraph 17 of the Complaint accurately quote the language of the Employment Agreement, but further states that the

Employment Agreement is invalid and terminable, that the Plaintiff fraudulently induced the Defendant to enter in the Employment Agreement, and that the Defendant signed the Employment Agreement under duress. To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself.

18. The Defendant denies the allegations as stated in paragraph 18 of the Complaint. To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself.

19. The Defendant states that the email correspondence referenced in paragraph 19 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

20. The Defendant states that the email correspondence referenced in paragraph 20 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

21. The Defendant states that the email correspondence referenced in paragraph 21 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

22.     The Defendant states that the email correspondence referenced in paragraph 22 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

23.     The Defendant states that the email correspondence referenced in paragraph 23 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

24.     The Defendant states that the email correspondence referenced in paragraph 24 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

25.     The Defendant states that the email correspondence referenced in paragraph 25 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

26.     The Defendant admits the allegations as stated in paragraph 26 of the Complaint that the Plaintiff sent the Plaintiff drafts of a proposed communications to the Assigned Clients in or around August and September 2022.

27.     The Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Complaint.  To the extent a substantive response is required, the Defendant denies the allegations.

28.     The Defendant denies the allegations contained in paragraph 28 of the Complaint.

29.     The Defendant admits that she spoke with Angel Williams on or around September 29, 2022, but otherwise denies the allegations contained in paragraph 29 of the Complaint.

30.     The Defendant admits the allegations contained in paragraph 30 of the Complaint. Further answering, the Defendant states that she never agreed to the content of the e-mail and never authorized the Plaintiff to send it on her behalf, but instead had specifically and expressly denied the Plaintiff permission to send such e-mail.

31.     The Defendant admits she informed individuals that she did not send or authorize the subject email as alleged in paragraph 31 of the Complaint, but is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 31 of the Complaint.

32.     The Defendant admits that she informed individuals that she did not write, send or authorize the subject email as alleged in paragraph 32 of the Complaint, but is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 32 of the Complaint.

33.     The Defendant denies the allegations contained in paragraph 33 of the Complaint.

34.     The Defendant states that the email correspondence referenced in paragraph 34 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other

contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

35. The Defendant denies the allegations contained in paragraph 35 of the Complaint.

36. The Defendant states that the email correspondence referenced in paragraph 36 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations.

37. The Defendant states that the email correspondence referenced in paragraph 37 of the Complaint speaks for itself, but cannot be properly understood without examining the subject email correspondence in its entirety, along with the surrounding context of the other contemporaneous communications between the Plaintiff, the Defendant and the clients. The Defendant otherwise denies the allegations. In particular, the Defendant denies that the subject portion of the email makes any purported suggestion or implication as alleged in paragraph 37 of the Complaint.

38. The Defendant denies the allegations contained in paragraph 38 of the Complaint.

39. The Defendant denies the allegations contained in paragraph 39 of the Complaint.

40. The Defendant admits that she was terminated from her employment on October 28, 2022, but denies the remainder of the allegations contained in paragraph 40 of the Complaint.

<u>Count I</u>
<u>Breach of Succession Agreement</u>

41. The Defendant restates and re-avers her responses to Paragraphs 1 through 40 of the Complaint as if fully set forth herein.

42. The Defendant denies the allegations contained in paragraph 42 of the Complaint.

43.     The Defendant denies the allegations contained in paragraph 43 of the Complaint.

44.     The Defendant denies the allegations contained in paragraph 44 of the Complaint.

45.     The Defendant states that the Succession Agreement referenced in paragraph 45 of the Complaint speaks for itself and incorporates by reference her response to paragraph 8 above.

46.     The Defendant denies the allegations as stated in paragraph 46 of the Complaint as the term "liquidated damages" is undefined in the Complaint and undefined under the Succession Agreement. Further answering, the Defendant states that the Succession Agreement speaks for itself and incorporates by reference her response to paragraph 8 above.

## Count II
## Breach of Employment Agreement

47.     The Defendant restates and re-avers her responses to Paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48.     The Defendant denies the allegations contained in paragraph 48 of the Complaint.

49.     The Defendant denies the allegations contained in paragraph 49 of the Complaint.

50.     The Defendant denies the allegations contained in paragraph 50 of the Complaint.

51.     The Defendant states that the Employment Agreement referenced in paragraph 51 of the Complaint speaks for itself and incorporates by reference her response to paragraph 11 above.

52.     The Defendant denies the allegations as stated in paragraph 52 of the Complaint as the term "liquidated damages" is undefined in the Complaint and undefined under the Employment Agreement. Further answering, the Defendant states that the Employment Agreement speaks for itself and incorporates by reference her response to paragraph 11 above.

53.     The Defendant denies the allegations as stated in paragraph 53 of the Complaint as the phrase "terminated within three years" is vague and undefined in the Complaint. Further

answering, the Defendant states that the Employment Agreement speaks for itself and incorporates by reference her response to paragraph 11 above.

54.     The Defendant admits the allegations as stated in paragraph 54 of the Complaint accurately quote the language of the Employment Agreement.  To the extent that the Plaintiff relies of the language of the Employment Agreement, the language of the document speaks for itself

55.     The Defendant denies the allegations as stated in paragraph 55 of the Complaint. Further answering, the Defendants states that the Employment Agreement speaks for itself and incorporates by reference her response to paragraph 11 above.

## Count III
## Defamation

56.     The Defendant restates and re-avers her responses to Paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57.     The Defendant denies the allegations as stated in paragraph 57 of the Complaint.

58.     The Defendant denies the allegations as stated in paragraph 58 of the Complaint.

59.     The Defendant denies the allegations as stated in paragraph 59 of the Complaint.

60.     The Defendant denies the allegations as stated in paragraph 60 of the Complaint.

## Count IV
## Breach of Fiduciary Duties

61.     The Defendant restates and re-avers her responses to Paragraphs 1 through 60 of the Complaint as if fully set forth herein.

62.     The Defendant denies the allegations as stated in paragraph 62 of the Complaint as the term "fiduciary duties" is vague and undefined in the Complaint, the Succession Agreement and Employment Agreement are both invalid and terminable for the reasons set forth in paragraphs 8 and 11 above, which are incorporated by reference.

63. The Defendant denies the allegations as stated in paragraph 63 of the Complaint.

64. The Defendant denies the allegations as stated in paragraph 64 of the Complaint.

## Count V
## Tortious Interference with Contract and Business Relationships

65. The Defendant restates and re-avers her responses to Paragraphs 1 through 64 of the Complaint as if fully set forth herein.

66. The Defendant denies the allegations contained in paragraph 66 of the Complaint.

67. The Defendant denies the allegations as stated in paragraph 67 of the Complaint.

68. The Defendant denies the allegations as stated in paragraph 68 of the Complaint.

69. The Defendant denies the allegations as stated in paragraph 69 of the Complaint.

70. The Defendant denies the allegations as stated in paragraph 70 of the Complaint.

71. The Defendant denies the allegations as stated in paragraph 71 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim against the Defendant upon which relief may be granted.

### Second Affirmative Defense

The Plaintiff's claims, if any, are barred insofar as the Plaintiff has not sustained any actual loss, injury or damage.

### Third Affirmative Defense

The Plaintiff's claims, if any, are barred insofar as the Defendant did not cause or proximately cause the Plaintiff to sustain any loss, injury, or damage, including without limitation because any damage the Plaintiff sustained was a result of its own conduct.

### Fourth Affirmative Defense

The Plaintiff's claims, if any, are barred insofar as the Plaintiff failed and/or refused to prevent or mitigate any of the alleged injuries, losses or damages.

### Fifth Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrines of waiver and/or estoppel.

### Sixth Affirmative Defense

The Plaintiff's claims, if any, are barred insofar as any alleged misconduct by the Defendant was unknowing, unintentional and otherwise innocent.

### Seventh Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrine of laches.

### Eighth Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrine of unclean hands.

### Ninth Affirmative Defense

The Plaintiff's claims, if any, are barred to the extent the parties executed a mandatory, binding arbitration agreement and the Defendant reserves the right to compel arbitration.

### Tenth Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrine of fraud and/or fraudulent inducement.

### Eleventh Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrine of illegality.

### Twelfth Affirmative Defense

The Plaintiff's claims, if any, are barred by the doctrine of duress.

## Thirteenth Affirmative Defense

The Plaintiff's claims, if any, are barred by the failure of consideration.

## Fourteenth Affirmative Defense

The Plaintiff's claims, if any, are barred due to its material breach of its agreements with the Defendant.

## Fifteenth Affirmative Defense

The Plaintiff's claims, if any, are barred because all actions taken by the Defendant with respect to the Plaintiff were undertaken in good faith and for legitimate business reasons.

## Sixteenth Affirmative Defense

The Plaintiff's claims, if any, are barred due to the Plaintiff's interference with the Defendant's business relationships and related conduct that damaged those relationships.

## Seventeenth Affirmative Defense

The Plaintiff is barred from any recovery as it would be unjustly enriched by any such recovery.

## Eighteenth Affirmative Defense

The Plaintiff's claims, if any, are barred because the Plaintiff is in breach of its duty of good faith and fair dealing to the Defendant.

## Nineteenth Affirmative Defense

The Plaintiff's damages, if any, are reduced under the doctrine of set off by damages that the Plaintiff caused to the Defendant.


The Defendant reserves the right to raise such other and further affirmative defenses as my come to be apparent in the further course of these proceedings, including during discovery.

**WHEREFORE,** the Defendant demands a trial by jury and respectfully prays for judgment and an award of attorneys' fees and costs incurred in defending against the within action.

## DEFENDANT'S COUNTERCLAIMS

Defendant Carolann Brown ("Ms. Brown"), by and through the undersigned counsel, hereby submits the following Counterclaims against Counter-Defendant Beck Bode, LLC (the "Company" or "Beck Bode"):

### I.    Parties

1.    Ms. Brown is a resident of the Town of Portsmouth, County of Newport, State of Rhode Island.

2.    Counter-Defendant Beck Bode is a Massachusetts limited liability company with its principal place of business located in the Commonwealth of Massachusetts.

3.    During the period relevant to this action, Counter-Defendant Beck Bode had gross revenue and sales exceeding $500,000.00, and otherwise qualified as an "enterprise engaged in commerce" under the FLSA.

### II.    Material Facts

*Ms. Brown's Background, Experience and Clients*

4.    Ms. Brown has worked in the financial industry for forty (40) years, both as a broker and more recently as an investment advisor, including at firms such as PaineWebber, Prudential Securities, Wachovia Securities and UBS Financial Services.

5.    At the time Ms. Brown joined Beck Bode at the beginning of 2022, she had approximately 300 clients with total assets under management in the hundreds of millions of dollars.

6.      All of Ms. Brown's accounts were self-generated. She developed her client base, most of whom began working with her thirty to forty years ago, through a variety of sources, including referrals, teaching, conducting seminars, participating in a radio show and from book signings for books that she authored.  She maintained strong personal ties with her clients, many of whom were close friends and family members, by, among other things, communicating with them regularly and frequently.

7.      As a result, Ms. Brown's clients had come to rely heavily on her financial experience and advice before selling or buying securities. Her clients would routinely expect her to develop a financial plan, present investment opportunities and/or otherwise advise as to how to invest. The advice and suggestions she provided carried significant weight with her clients. Her clients had come to recognize and value her specialized expertise, years of experience and detailed knowledge of the market and their portfolios and would consistently follow her guidance in selecting investments.

### Beck Bode Lures Ms. Brown and her Clients to Join the Firm under False Pretenses

8.      In late August, 2021, Ms. Brown left UBS, after which she briefly served as a registered investment advisor through Pallas Capital Advisors, LLC.

9.      In late 2021, a friend of Ms. Brown's and recruiter, Marshall Dorr, reached out to Ms. Brown about a potential new employment opportunity.

10.     At that time, Mr. Dorr introduced Ms. Brown to Beck Bode, a small boutique firm with less than $250 million under management and primarily only a single investment strategy.

11.     While Ms. Brown had reservations about the fact that Beck Bode had only one investment strategy, the firm, primarily through its managing partners, Benjamin Beck and James Bode, assured her she could bring her own investment strategies to the firm.

12.     Ms. Brown told Beck Bode that she would join the firm if it would ensure that she could continue charging her clients annual fees in the amount of 1% (or less) of assets under management, hire a team to move her accounts over, and provide her a sales assistant, to which Beck Bode agreed.

13.     Ms. Brown also indicated that she wished to continue to offer her clients her protected equity strategies, and use options, to which Beck Bode agreed.

14.     Beck Bode also agreed to advertise Ms. Brown and her team to her clients as the "Brown Group" while the team transitioned to Beck Bode.

15.     Based upon these representations by Beck Bode and in reliance upon same, Ms. Brown agreed to become an employee of Beck Bode.

16.      Accordingly, Ms. Brown and Beck Bode entered into an employment agreement on or about December 30, 2021 (the "Original Employment Agreement").  A copy of the Original Employment Agreement is attached hereto at Exhibit A.

17.     The Original Employment Agreement provided, among other things, that Ms. Brown would serve as an investment advisor representative for the firm servicing the investment management accounts of her clients, for which she would be entitled to compensation in the amount of 60% of all revenues received by Beck Bode from clients she introduced to the firm.

18.     The Original Employment Agreement also provided that the company would provide her with access to its administrative staff and hire a sales assistant for her.

19.     The Original Employment Agreement further contemplated that Ms. Brown's licenses and registration would be renewed, which she understood and expected, based on her discussions with Beck Bode and prior experience in the industry, would be taken care of by Beck Bode.

20.     In addition to the Original Employment Agreement, Beck Bode provided Ms. Brown with a form Investment Advisory Agreement to provide to clients, which stated the clients would pay an annual fee for investment management services in the amount of 1% of the market value of assets under management.

### *Beck Bode Violates the Original Employment Agreement*

21.     Almost immediately after entering into the Original Employment Agreement, Beck Bode began violating its promises to Ms. Brown.

22.     For instance, Ms. Brown's name did not appear on any advertising materials, account opening materials, statements or other documents.

23.     Beck Bode also failed and/or refused to list Ms. Brown on the firm's web site.

24.     Beck Bode also failed and/or refused, contrary to its prior promises, to allow Ms. Brown to recommend her own investment strategy to clients or allow her clients to trade options.

25.     Beck Bode also made it extremely difficult for Ms. Brown to access information regarding her clients' accounts, insisting that her clients cease using Fidelity as a trading platform and switch instead to Charles Schwab's platform, but refusing to train Ms. Brown as to how, for example, she could see new assets coming into her clients' Charles Schwab accounts.

26.     Furthermore, the process of transferring client accounts into Beck Bode was very disorganized, resulting in client assets from one old account being distributed among multiple

different new accounts, making it even more difficult for Ms. Brown to track clients' holdings and make appropriate investment recommendations to them.

27.     Beck Bode also sent paperwork to Ms. Brown's clients to switch their trading platform from Fidelity to Charles Schwab without telling Ms. Brown beforehand.

28.     As just one of many examples of Beck Bode's disruption of Ms. Brown's relationships with her clients, in February 2022, Mr. Beck, without advising Ms. Brown beforehand, flew to Florida to visit some of Ms. Brown's clients.  These clients were a family with approximately $30 million in assets under management, with whom Ms. Brown had worked for approximately 40 years.  During this meeting, Mr. Beck requested these clients to switch trading platforms from Fidelity to Charles Schwab, the latter of which would be less costly to Beck Bode. The clients were extremely upset after this meeting that Ms. Brown was not included, that Mr. Beck was telling them what to do with their trading platform, and that Beck Bode had been disorganized and unresponsive even prior to the meeting, such as by failing to provide account statements after the initial transfer of accounts.

29.     Ms. Brown's clients understandably expressed concern to her about all of this, indicating that they wanted to work with her, and not with other "strangers" at Beck Bode.  As a result, Ms. Brown lost several valuable clients with at least tens, if not hundreds, of millions of dollars in assets under management.

30.     Beck Bode also breached its agreement to hire a sales assistant for Ms. Brown. While the firm did eventually hire an individual named Christine Markham in August, 2022,  Ms. Markham only worked part-time for Ms. Brown.

31.     In addition, under the Original Employment Agreement, Beck Bode agreed to pay the salary of one (1) full-time employee at Ms. Brown's office. This never occurred. In fact, Ms. Brown paid part-time employees directly in excess of $12,000.00 for work performed.

32.     Beck Bode has failed and/or refused to compensate or reimburse Ms. Brown for this expense.

33.     Beck Bode also apparently failed and/or refused to renew Ms. Brown's licenses or registration, and failed to inform her of the same.

***Beck Bode Fraudulently Induces Ms. Brown to Enter into a "Succession Agreement"***

34.     Notwithstanding the foregoing issues, Ms. Brown still believed as of March, 2022 that it was possible for her to work out the issues that had arisen at Beck Bode.

35.     At the same time, Ms. Brown envisioned as a long-term plan to transition her business to her son, Michael Brown, who was also a broker and investment advisor, and who had worked with Ms. Brown at Prudential, Wachovia, and UBS.

36.     As such, Mr. Beck, Mr. Bode, Ms. Brown and Mr. Brown discussed the possibility of Mr. Brown joining Beck Bode as an investment advisor representative.

37.     On or about March 28, 2022, Mr. Brown and Ms. Brown met with Mr. Beck and Mr. Bode.

38.     During this meeting, Beck Bode presented the Browns with an employment agreement for Mr. Brown, an amended and restated employment agreement for Ms. Brown (the "Second Employment Agreement"), and a "Business Succession Agreement" for Ms. Brown (the "Succession Agreement"). A copy of the Succession Agreement is attached hereto at Exhibit B and a copy of the Second Employment Agreement is attached hereto at Exhibit C.

39.     Prior to this meeting, Ms. Brown had no idea that there was going to be any formal succession agreement. From Ms. Brown's perspective, the parties were meeting to have Mr. Brown sign an employment agreement with Beck Bode, following which Ms. Brown would naturally transition her business to her son at Beck Bode over time.

40.     Based on the discussions between Ms. Brown and Beck Bode up until that point, Ms. Brown expected the documents would reflect that the pay-out to Ms. Brown under the Original Employment Agreement, in the amount of 60% of all revenues received by Beck Bode from clients she introduced to the firm, would be adjusted such that 30% of all such revenues would go to her, and 30% would go to her son, Mr. Brown.

41.     Although Ms. Brown did not have an opportunity to fully review or digest the documents at the March 28, 2022 meeting, she did see that Beck Bode had now introduced the idea of a "Succession Agreement" into the mix, pursuant to which Beck Bode would buy her out.

42.     As contemplated by Beck Bode, the Succession Agreement was to provide that only 30% of the net revenues from the "Assigned Clients" whose "Client Relationships" would be transferred would be paid to her over a defined seven-year period.

43.     At the March 28, 2022 meeting, Ms. Brown insisted that the documents be adjusted to reflect that, while 30% of such net revenues would be paid to her, another 30% of such net revenues would be paid to her son as part of the buy-out.

44.     Mr. Beck and Mr. Bode agreed to this at the meeting, promising to amend the documents after-the-fact to reflect this and provide Mr. Brown his own succession agreement.

45.     However, Mr. Beck and Mr. Bode insisted that the Browns sign the documents as they were for the time being, applying heavy pressure and indicating that they would not enter into an employment agreement with Mr. Brown otherwise.

46.     In reliance on Beck Bode, Mr. Beck and Mr. Bode's representations that they would provide Mr. Brown a succession agreement, Ms. Brown reluctantly, and under duress, executed the Succession Agreement.

47.     Ms. Brown executed the Succession Agreement and agreed to reduce her payment term from 60% of net revenues to 30% in exchange for her son, Mr. Brown, being provided his own succession agreement with 30% of net revenues.

48.     Despite repeated requests, Beck Bode, Mr. Beck and Mr. Bode have failed or refused to provide Mr. Brown with his succession agreement as promised.

49.     Despite Beck Bode, Mr. Beck and Mr. Bode's material representations that the Succession Agreement would be amended to reflect this agreement and that Mr. Brown be provided his own succession agreement, they have failed and/or refused to do so.

50.     As such, Beck Bode, through Mr. Beck and Mr. Bode, fraudulently induced Ms. Brown to enter into the Succession Agreement and the Second Employment Agreement.

51.     Therefore, because Beck Bode fraudulently induced Ms. Brown to sign the Succession Agreement and the Employment Agreement, there was no "meeting of the minds" and, thus both contracts are terminable.

52.     Based upon the unlawful acts and/or omissions of Beck Bode, Mr. Beck and Mr. Bode, they never intended to provide Mr. Brown his own succession agreement, but instead made such false representations to induce Ms. Brown to sign the Succession Agreement which included a much lower payment term, thus realizing significantly more profits for themselves.

53.     Following the signing of the Succession Agreement by Ms. Brown, the Second Employment Agreement for Ms. Brown, and an employment agreement for Mr. Brown on March 28, 2022, Ms. Brown understood that her son would take over the role of acting as investment

advisor representative for her clients, but that she would still be permitted to play a consulting role in connection with that transition.

54.     In addition, although Ms. Brown executed the Succession Agreement on March 28, 2022, the agreement is materially incomplete and thus invalid.

55.     Beck Bode failed to designate any of the so-called "Assigned Clients" under the Succession Agreement and/or failed to list these "Assigned Clients" in Schedule A of the Succession Agreement.

56.     As purportedly defined under the Succession Agreement, these "Assigned Clients" were and continue to be individuals who Ms. Brown maintained as investment clients prior to her joining Beck Bode.

57.     The Succession Agreement purported to transfer the interests in the Assigned Clients from Ms. Brown to Beck Bode.

58.     However, as stated above, neither Beck Bode nor Ms. Brown designated or listed these clients in the Succession Agreement.

59.     The designation of these "Assigned Clients" was an integral part of the Succession Agreement.   Accordingly, the failure to include such information invalidates the Succession Agreement.

***Beck Bode Violated its Agreements with Ms. Brown and her Son, to the Detriment of the Browns' Clients***

60.     Almost immediately after signing the March 28, 2022 agreements, Beck Bode began to violate both the letter and the spirit of those agreements by attempting to cut Ms. Brown and her son off from her clients and arrogate those clients entirely for itself.

61.     As an initial matter, Beck Bode instructed Ms. Brown *not* to communicate with her clients at all, unless she advised them to adopt the firm's investment strategy and pushed those

clients to agree to pay fees of 2-3%, which was higher than they had ever paid with Ms. Brown and higher than contemplated in the original investment advisory agreements the firm had provided to those clients.

62. Beck Bode, through its Chief Operating Officer, Dan Kline, also told Ms. Brown that it was "canceling" her licenses and registrations, even though it turned out the firm, without informing her and contrary to her understanding that it had done so, had apparently never renewed her licenses and registrations upon her original hire at the end of December, 2021.

63. Similarly, although Beck Bode had entered into an employment agreement with Mr. Brown to act as an investment advisor representative, it apparently never renewed his licenses or registrations either.

64. Shortly after March 28, 2022, Beck Bode began a concerted campaign of meeting and communicating with Ms. Brown's clients without telling her or inviting her to be present.

65. In addition, Beck Bode appointed an individual named Vincent Savio to act as a so-called "financial adviser" to and work with her clients, meeting with them and soliciting them to invest in Beck Bode's program.

66. Beck Bode held Mr. Savio out as a registered investment advisor, both in direct communications with Ms. Brown's clients and on its website, on which it identified him as a "financial adviser," even though he was never registered and/or licensed and had no experience or educational background in the world of securities.

67. Most clients resisted these solicitation efforts by Beck Bode, both because the Beck Bode investment program was not performing well, and because they did not wish to pay fees up to 3% of assets under management.

68.     As a result of Beck Bode's conduct, a spate of customer complaints by Ms. Brown's clients against Beck Bode began being made.  Such customer complaints, many of which resulted in clients leaving Beck Bode prior to Ms. Brown's termination, include, but are not limited to, the following sales practice violations and breaches of fiduciary duty:

- Charging excessive fees of 2-3% of assets under management (even for assets held in cash) and failing to properly disclose to clients the fees Beck Bode was charging or obtain authorization from the clients for the charging of those fees;

- Trading securities without client authorization or approval, including selling stocks that clients specifically told Beck Bode not to sell, failing to buy stocks that clients specifically instructed Beck Bode to buy and selling stocks without approval that resulted in adverse tax consequences and losses to the clients;

- Offering only a single investment program without considering the suitability of that program for any individual clients, failing to develop a financial plan for the clients or obtain even a basic understanding of the clients' financial situation, investment objectives and risk tolerance;

- Refusing to listen to input from the clients, some of whom are sophisticated investors, regarding the clients' desired investment approach, or the suggested use of hedging or options to minimize investment risk, which resulted in poor performance in the accounts;

- Mismanagement, disorganization and delay with respect to the transfer of accounts and difficulty getting from Beck Bode an accounting, financial statements or other information regarding their new accounts; and,

- Refusing to allow Ms. Brown or her son to be involved with the accounts, including not allowing the Browns to communicate with the clients and/or cutting off access to information regarding the clients' accounts, and failing to otherwise provide direct, personal attention to the accounts, even though Beck Bode had originally promised clients that the Browns would be actively involved with the accounts.

69.     In light of all of the foregoing, Beck Bode plainly failed to act consistently with its Best Interest Obligation under Rule 15l-1(a) of the Securities Exchange Act of 1934 ("Reg BI") or its obligation under the Fiduciary Rule promulgated by the Massachusetts Securities Division, 950 CMR 12.207.

70.     Among other things, Beck Bode failed to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with its one-size-fits-all investment program recommendation to all of these clients, without regard to their individual financial circumstances or objectives.

71.     Beck Bode had no reasonable basis to believe that its recommendations to Ms. Brown's clients were in all of the clients' best interests, based on their investment profiles and the potential risks, rewards, and costs associated with the recommendations.

72.     Beck Bode's conduct violated both Reg BI and the Massachusetts Fiduciary Rule.

***Beck Bode Violated the Wage Act by Failing to Pay Ms. Brown Due Wages and Terminating her Employment After She Complained About Such Unlawful Conduct***

73.     During the period of March 28, 2022 through the date of her termination on or about October 28, 2022, Ms. Brown was employed by Beck Bode as a Senior Client Consultant, in accordance with the Second Employment Agreement.

74.     Under the Second Employment Agreement, Ms. Brown  was paid an annual salary of $36,000.00.

75.     While employed as a Senior Client Consultant under the Second Employment Agreement, Beck Bode failed and/or refused to compensate Ms. Brown for any work performed.

76.     For all of the weeks worked from March 28, 2022 until October 28, 2022, Beck Bode failed to pay Ms. Brown any wages or other compensation for hours worked as a Senior Client Consultant.

77.     On several occasions in the summer and fall of 2022, Ms. Brown complained to the Mr. Beck and Mr. Bode as well as other Beck Bode employees that she was not being compensated for her work performed at the company.

78.     On September 6, 2022 and October 6, 2022, Ms. Brown, through her counsel, served pre-litigation letters on Beck Bode and its counsel.  In these letters, Ms. Brown alerted Beck Bode that she had retained counsel for the purpose of prosecuting claims against Beck Bode arising from Beck Bode's failure to pay Ms. Brown's wages in violation of the wage payment requirements and protections of the FLSA and Massachusetts law.

79.     Because Ms. Brown complained to Beck Bode, directly and through her counsel, about the wage violations, Beck Bode subjected Ms. Brown to retaliatory conduct.

80.     For instance, Beck Bode engaged in several misleading communications with clients, including, but not limited to, telling them that Ms. Brown had been fired prior to her termination.

81.     Beck Bode also sent emails to clients under Ms. Brown's name purporting to be from Ms. Brown and purporting  to transition her business to others at the firm, including an email dated October 4, 2022, even though she never approved and in fact had specifically and expressly declined the sending of any such emails.

82.     Beck Bode also told at least one of her clients that the company was buying her out because she was getting older and the firm needed to "protect its clients."  Beck Bode personnel made similar comments to Ms. Brown directly, such as that it was "not worth training" her and that the firm needed to "take over" her communications with clients because she would not be able to handle them herself.  These comments, in combination with the firm's conduct in excluding Ms. Brown from communications and meetings with clients, are highly suggestive of workplace retaliation.

83.     On or about October 28, 2022, due to Ms. Brown's wage violation complaints, Beck Bode terminated Ms. Brown's employment.

84. Beck Bode's termination of Ms. Brown's employment was directly and proximately motivated and caused by a knowing and intentional motive of retaliation by Beck Bode and against Ms. Brown arising from Ms. Brown submitting a complaint and formal request to Beck Bode for payment of unpaid wages and damages by Beck Bode to Ms. Brown arising from Beck Bode's violations of wage payment requirements of the FLSA and Massachusetts law.

85. Beck Bode would not have terminated Ms. Brown's employment but for Beck Bode's retaliatory motive against Ms. Brown arising from Ms. Brown submitting a complaint and formal request to Beck Bode for payment of unpaid wages and damages by Beck Bode to Ms. Brown arising from Beck Bode's violations of the wage payment requirements of the FLSA and Massachusetts law.

86. Beck Bode's acts of retaliation and termination of Ms. Brown's employment directly and proximately caused Ms. Brown to suffer substantial anger, stress, anxiety, and related emotional damages.

87. Beck Bode's acts of retaliation and termination of Ms. Brown's employment directly and proximately caused Ms. Brown to suffer financial loss, including lost past and future wages.

88. Pursuant to M.G.L. c. 149 § 150, on November 16, 2022, Ms. Brown filed her required statutory claims with the office of the Attorney General, and the Attorney General issued Ms. Brown a right to sue letter.

***Beck Bode has Unlawfully Deducted Monies from Payments Under the Succession Agreement and has Refused to reimburse Ms. Brown Owed Business Expenses.***

89. Although the Succession Agreement is not valid and otherwise terminable, Beck Bode continued to make payments to Ms. Brown under the terms and conditions of the agreement.

90.     In August, 2022, Ms. Brown received her first quarterly payment under the Succession Agreement.

91.     Beck Bode inexplicably deducted $60,000.00 from this quarterly payment for reimbursement of so-called "expenses."

92.     Ms. Brown inquired about the basis for this deduction; however, Beck Bode failed and/or refused to provide same.

93.     In addition, during her employment at Beck Bode, Ms. Brown expended $15,000.00 for office rental space in Newport, Rhode Island, which Beck Bode agreed to reimburse her.  Beck Bode has failed and/or refused to provide this reimbursement.

94.     Ms. Brown also paid approximately $6,000.00 for utilities and supplies at her rental space in Newport, Rhode Island, for which Beck Bode agreed to reimburse her.  Beck Bode has failed and/or refused to provide this reimbursement as well.

95.     Ms. Brown complained, directly and through counsel, to Beck Bode about the deduction and failure to reimburse for expenses.

96.     As a result of these complaints, Beck Bode retaliated against Ms. Brown and terminated her employment.

### III.     Claims for Relief

### Count One
### Fraud

97.     Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein

98.     Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, fraudulently induced Ms. Brown to execute the Succession Agreement and the

Second Employment Agreement by making material misrepresentations in which Ms. Brown relied upon to her detriment, thereby causing Ms. Brown to sustain damages as aforesaid.

**Count Two**
**Material Misrepresentation**

99.     Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

100.    Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, intentionally and/or negligently made material misrepresentations to Ms. Brown, thereby causing Ms. Brown to sustain damages as aforesaid.

**Count Three**
**Breach and Material Breach of Contract**

101.    Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

102.    Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, breached and materially breached the contractual agreement or agreements entered into with Ms. Brown, thereby causing Ms. Brown to sustain damages as aforesaid.

**Count Four**
**Tortious Interference with Business Relations**

103.    Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

104.    Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, tortiously interfered with the business relations between Ms. Brown and her clients as detailed above, thereby impeding and preventing Ms. Brown from maintaining her advantageous business relationships with her clients and to continue to benefit economically from such relationships, thereby causing Ms. Brown to suffer damages as aforesaid.

**Count Five**
**The Massachusetts Consumer Protection Act, M.G.L. 93A, *et seq.***
**(Unfair and Deceptive Business Practices)**

105.     Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

106.     Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, engaged in deceptive and unfair acts in the conduct of trade or commerce substantially and primarily within the Commonwealth, such as, but not limited to, making fraudulent and misleading statements that reasonably caused Ms. Brown to execute the Succession Agreement, whereby she otherwise would not have, thereby causing Ms. Brown to sustain damages as aforesaid.

**Count Six**
**Breach of Fiduciary Duties**

107.     Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

108.     Beck Bode, by its acts and/or omissions, including, but not limited to, those described herein, breached their fiduciary duties owed to Ms. Brown, thereby causing Ms. Brown to suffer damages as aforesaid.

**Count Seven**
**M.G.L. c. 151 §§ 1 & 7**
**(Failure to Pay Minimum Wage)**

109.     Ms. Brown hereby incorporates all the preceding paragraphs of her Counterclaim by reference as if fully set forth herein.

110.     The Massachusetts Minimum Wage Act required Beck Bode to pay Ms. Brown as alleged above, during the period of her employment.

111. During the period of Plaintiff's employment from March 28, 2022 until October 28, 2022, Beck Bode failed to pay Ms. Brown wages for all compensable hours worked at an hourly rate at least equal to the Massachusetts Minimum Wage.

112. During the entire period of Ms. Brown's employment, Beck Bode had actual knowledge of the Massachusetts Minimum Wage Act wage payment requirements.

113. During the entire period of Ms. Brown's employment, Beck Bode knowingly and/or intentionally violated the wage payment requirements of the Massachusetts Minimum Wage Act.

114. Beck Bode's violations of the Massachusetts Minimum Wage Act were not the product of good faith, innocent mistake, or any other mitigating circumstance.

**Count Eight**
**M.G.L. c. 149 §§ 148 & 150**
**(Failure to Pay for Work Performed)**

115. Ms. Brown hereby incorporates all the preceding paragraphs of the Counterclaim by reference as if fully set forth herein.

116. The Massachusetts Wage Payment Act required Beck Bode to pay Ms. Brown all wages earned and owed within seven (7) days of the termination of the pay period during which the wages were earned.

117. As alleged above, from March 28, 2022 until October 28, 2022, Beck Bode failed to pay Ms. Brown the full amount of wages earned and owing for all hours worked.

118. As alleged above, from March 28, 2022 until October 28, 2022, Beck Bode failed to pay Ms. Brown all wages earned and owed each pay period, or within seven (7) days of the termination of each pay period.

119. During the entire period of Ms. Brown's employment, Beck Bode had actual knowledge of the Massachusetts Wage Payment Act's wage payment requirements.

120. During the period of Ms. Brown's employment from March 28, 2022 until October 28, 2022, Beck Bode knowingly and/or intentionally failed to pay Ms. Brown full and timely wages for all compensable hours worked each pay period in direct violation of the Massachusetts Wage Payment Act.

121. Beck Bode's violations of the Massachusetts Wage Payment Act were not the product of good faith, innocent mistake, or any other mitigating circumstance.

**Count Nine**
**Violation of the FLSA**
**(Failure to Pay Statutory Minimum Wage)**

122. Ms. Brown hereby incorporates all the preceding paragraphs of the Counterclaim by reference as if fully set forth herein.

123. The FLSA required Beck Bode to pay Ms. Brown for all hours worked at an hourly rate at least equal to the applicable Federal Minimum Wage.

124. As alleged above, during the period of Ms. Brown's employment from March 28, 2022 until October 28, 2022, Beck Bode paid Ms. Brown no wages for all hours worked.

125. During the period of Ms. Brown's employment from March 28, 2022 until October 28, 2022, Beck Bode failed to pay Ms. Brown wages for all compensable hours worked at an hourly rate at least equal to the Federal Minimum Wage.

126. During the entire period of Ms. Brown's employment, Beck Bode had actual knowledge of the FLSA Minimum Wage payment requirements.

127.    During the period of Ms. Brown's employment from March 28, 2022 until October 28, 2022, Beck Bode knowingly and/or intentionally violated the Minimum Wage payment requirements of the FLSA.

128.    Beck Bode's violations of the FLSA's Minimum Wage payment requirements were not the product of good faith, innocent mistake, or any other mitigating circumstance.

**Count Ten**
**Unlawful Retaliation/Termination - Massachusetts Law**

129.    Ms. Brown hereby incorporates all the preceding paragraphs of the Counterclaim by reference as if fully set forth herein.

130.    The Massachusetts Wage Act, Massachusetts General Laws c. 149, § 148A, provides, "No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." … "Any employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general ***or any other*** ***person***, or assists the attorney general in any investigation under this chapter, or has instituted, or caused to be instituted any proceedings under or related to this chapter, or has testified or is about to testify in any such proceedings, shall have violated this section and shall be punished or shall be subject to civil citation or order as provided in [ § ] 27C" (emphasis added).

131.    Beck Bode subjected Ms. Brown to retaliatory conduct, including, but not limited to, terminating her employment, because she complained, directly and through counsel, to Beck Bode about its failure to compensate her for all hours worked.

132.    Beck Bode's termination of Ms. Brown's employment was directly and proximately motivated and caused by a knowing and intentional motive of retaliation by Beck Bode and against Ms. Brown arising from Ms. Brown submitting a complaint and formal request

to Beck Bode for payment of unpaid wages and damages by Beck Bode to Ms. Brown arising from Beck Bode's violations of the minimum wage compensation and wage payment requirements of Massachusetts law.

**Count Eleven**
**Unlawful Retaliation/Termination – FLSA**

133.    Ms. Brown hereby incorporates all the preceding paragraphs in the Counterclaim by reference as if fully set forth herein.

134.    The FLSA provides that it is unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or cased to be instituted any proceeding under [the FLSA]… " 29 U.S.C. § 215(a)(3).

135.    Beck Bode subjected Ms. Brown to retaliatory conduct, including, but not limited to, terminating her employment, because she complained, directly and through counsel, to Beck Bode about its failure to compensate her for all hours worked.

136.    Beck Bode's termination of Ms. Brown's employment was directly and proximately motivated and caused by a knowing and intentional motive of retaliation by Beck Bode and against Ms. Brown arising from Ms. Brown submitting a complaint and formal request to Beck Bode for payment of unpaid wages and damages by Beck Bode to Ms. Brown arising from Beck Bode's violations of the minimum wage compensation and wage payment requirements of the FLSA.

**IV.    Jury Demand**

Ms. Brown requests a trial by jury on all facts and issues so triable relative to the Counterclaim.

**V.    Prayers For Relief**

Ms. Brown respectfully prays this Court or a jury enter the following relief:

1.      judgment in favor of Plaintiff and against Beck Bode;

2.      an award of damages that are due to Ms. Brown;

3.      statutory liquidated damages on all wage-related damages;

4.      economic, compensatory, emotional, and punitive damages arising from Beck Bode's unlawful conduct;

5.      an award of statutory interest, costs and attorney's fees; and,

6.      such further relief as this Court or a jury may adjudge necessary and appropriate.


Defendant/Counter-Plaintiff,
By her attorneys,

**LAW OFFICE OF MICHAEL D. PUSHEE**

Dated: December 27, 2022           /s/ Michael D. Pushee
                                   Michael D. Pushee (BBO #657343)
                                   100 Midway Place, Suite 16
                                   Cranston, RI 02920-5707
                                   (401) 214-9820
                                   (401) 214-9840 (facsimile)
                                   mpushee@pusheelaw.com


**SHAPIRO HABER & URMY LLP**

Dated: December 27, 2022           /s/ Ian J. McLoughlin
                                   Ian J. McLoughlin (BBO#647203)
                                   One Boston Place, Suite 2600
                                   Boston, Massachusetts 02108
                                   (617) 208-4714
                                   (617) 439-0134 (facsimile)
                                   imcloughlin@shulaw.com

## CERTIFICATION

I hereby certify that, on this 27th day of December, 2022, the within document was electronically filed and served through the Court's Electronic Filing System and is available for viewing and/or downloading from the electronic filing system.

/s/ Michael D. Pushee